UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

WILLIE RAY SHED                        CIVIL ACTION NO. 04-1080-P

versus                                 JUDGE HICKS

WARDEN T. W. THOMPSON                   MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

A Caddo Parish jury convicted Willie Ray Shed ("Petitioner") of possession of a firearm by a convicted felon.  Petitioner pursued a direct appeal.  State v. Shed, 828 So.2d 124 (La. App. 2 Cir. 2002), writ denied, 861 So.2d 561(La. 2003).  He then filed this action seeking federal habeas relief on the sole ground that he was denied his Sixth Amendment right to effective assistance of counsel because trial counsel failed to file a motion to suppress evidence obtained pursuant to an allegedly illegal search.  It is recommended, for the reasons that follow, that the petition be granted.

**Background Facts**

At approximately 9:00 p.m. on January 2, 2001, Petitioner was in a back room of his house.  Nobody else was in the house with Petitioner except Clarence Lee ("Lee"), a carpenter who worked with Petitioner. Lee stepped outside the house about the same time that Agents Jason Brook ("Brook") and Jerry Oglee ("Oglee") of the narcotics division of the Shreveport Police Department were approaching the house.  Lee, who may or may not have

seen the approaching officers, went back inside the house and shut the door behind him just before the officers arrived.

The officers had received complaints from people in the neighborhood that drug activity was occurring at the house, and they were there to conduct a "knock and talk" inquiry.  The testimony, discussed in more detail below, is not consistent about how the events unfolded after this point, but the officers ended up entering the home without a warrant. They seized crack cocaine and firearms.

Petitioner was arrested and charged with possession of a firearm by a convicted felon. Michael Vergis ("Vergis"), an attorney with the Caddo Parish Indigent Defender Office, was appointed to represent Petitioner.  Vergis did not file a motion to suppress the evidence obtained pursuant to the search of Petitioner's house.  At trial, Vergis advanced the arguments that Petitioner did not possess the firearms, and alternatively, that Petitioner was justified in possessing the firearms.  These arguments were unsuccessful, and Petitioner was found guilty and sentenced to 10 years incarceration.[1]

---

[1] Petitioner has since been charged with drug crimes in federal court and he is currently in federal custody awaiting sentencing. See U.S. v. Crawford, et. al, 06 CR 50165-03. Petitioner pleaded guilty to conspiracy to possess cocaine with intent to distribute. The federal charges arose from a separate but similar incident, in which officers who executed a search warrant in October 2006 found crack cocaine in the kitchen of a home where Petitioner and two other men were present.

**Standard of Review**

The claim presented in this petition is properly reviewed under 28 U.S.C. § 2254(d)(1). That statute provides that a federal court may not grant habeas relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

Under the "contrary to" clause of 28 U.S.C. § 2254(d)(1), a federal habeas court may grant the writ only if the State court (1) arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) decided the case differently than the Supreme Court on a set of materially indistinguishable facts. Williams v. Taylor, 120 S.Ct. 1495, 1519 (2000).

Under the "unreasonable application" clause – the clause that applies to most claims – a federal court is permitted to grant the writ if the State court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. Williams, supra at 1523. Even if the federal court, in its independent judgment, has a firm conviction that the State court was incorrect in its application of a federal constitutional principle, this alone does not permit the federal court to grant habeas relief. Relief is not permitted unless the State court decision was so wrong as to be objectively unreasonable. Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003).

**Ineffective Assistance of Counsel**

### A. Generally

Petitioner bears the burden of proving two components, deficient performance and prejudice, to establish ineffective assistance of counsel.  Counsel's performance was deficient only if he made errors so serious that, when reviewed under an objective standard of reasonable professional assistance and afforded a presumption of competency, he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  <u>Strickland v. Washington</u>, 104 S.Ct. 2052, 2064 (1984).  Prejudice exists only if there is a reasonable probability that, but for the error, the result of the trial would have been different.  A reasonable probability is one sufficient to undermine confidence in the outcome.  <u>Id</u>. at 2068.

### B. Failure to Move to Suppress

"Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is *meritorious* and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice."  <u>Kimmelman v. Morrison</u>, 106 S.Ct. 2574, 2583 (1986) (emphasis added).

The Fifth Circuit addressed a similar <u>Strickland</u> claim three years after <u>Kimmelman</u> was decided.  The Court did not cite <u>Kimmelman</u>, but it articulated a similar prejudice standard that required the habeas petitioner to show that a motion to suppress, if filed by counsel, would, or at least in all likelihood would, be granted. <u>Kirkpatrick v. Butler</u>, 870 F.2d

276, 283 (5th Cir. 1989). In <u>Kirkpatrick</u> the Court found that the Fourth Amendment claim in question "was genuinely a close call" but:

> Despite the difficulty of the fourth amendment issue, we do not find clearly erroneous the district court's judgment that had a motion to suppress the evidence seized from Kirkpatrick's apartment been filed, it would have been denied; the items seized from the apartment would, in all likelihood, have been admitted into evidence, and the outcome of the trial would have remained unchanged.

<u>Id</u>.

The Fifth Circuit has continued in later decisions to equate a "meritorious" motion to suppress with one that would likely have been granted, as opposed to a motion for which there is merely some good faith basis to pursue.  <u>See</u>, <u>e.g.</u>, <u>Ward v. Dretke</u>, 420 F.3d 479, 488 (5th Cir. 2005) ("We have held that 'counsel's failure to move to suppress evidence, when the evidence would have been suppressed if objected to, can constitute deficient performance.'"); <u>Martin v. Maxey</u>, 98 F.3d 844, 848 (5th Cir. 1996) (same); and <u>U. S. v. Alanis</u>, 88 Fed. Appx. 15, 22 (5th Cir. 2004) ("[I]f he succeeds on his Sixth Amendment claim, he will have established the validity of his Fourth Amendment claim because the merits of his Fourth Amendment claim are an element of his ineffective-assistance-of-trial-counsel claim.").

**The Testimony**

### A. Introduction

Petitioner was, as a result of his encounter with the officers, charged in two separate state court proceedings.  In this case, State Court No. 213,063, Petitioner was charged with

possession of a firearm by a convicted felon (with the previous conviction being for distribution of schedule II CDS).  The other proceeding was a drug charge against Petitioner arising from the same arrest.[2]

There were two occasions in state court for Officer Oglee, Officer Brook, and Clarence Lee to testify about the events that led to the discovery of the firearms that underlie the conviction at issue. There was the trial in the felon-in-possession case and  a pretrial "free and voluntary" hearing in the state-court drug prosecution. This court also held an evidentiary hearing  and permitted the parties to present any evidence they had relevant to the issue. Clarence Lee and attorney Michael Vergis testified at the federal hearing, but no party chose to call Officers Brook or Oglee. The officers' written reports of the incident were received into evidence as part of attorney Vergis's file. Each of those sources of information about the claimed Fourth Amendment violation will be reviewed below.

### B. Testimony from the  Felon-in-Possession Trial

Agent Jason Brook testified at the felon-in-possession trial that he and Agent Gary Oglee went to Petitioner's residence to conduct a knock and talk operation because police

---

[2] The district attorney filed the record of the state court proceedings stemming from the felon-in-possession charge, but Volume II was not scanned into the electronic record and has been misplaced.  The district attorney, when informed of that situation, provided the court a transcript of the testimony that was adduced at trial on August 8, 2001.  Doc. 16. That testimony appears, based on the index, to include the only material that was in Volume II that is necessary to a decision of this petition.  The other material, such as appellate briefs and decisions, is either unnecessary to a decision or is available from other sources.  Citations to trial testimony will be to the pages in the exhibit marked "Transcript of August 8, 2001 Proceedings" found at Doc. 16.

"had received different complaints from concerned citizens" about drug activity related to the house.  Brook described a knock and talk operation as when two or more officers go up to a residence about which they have received complaints, knock on the door, make contact with the homeowner or renter, advise them of the nature of the complaint and ask for consent to search.

Brook testified that when he and Oglee walked up to the door and knocked on it, they were met by Clarence Lee.  Brook then testified:

> Once Mr. Lee came to the door we advised him what we were there for. Asked him if he was the home owner.  He said no, he was in the back of the house, to come in and he would get him.  We stepped inside the kitchen.  Mr. Lee went to the back of the residence to get Mr. Shed.  There is a washing machine that's actually in the kitchen area and in plain view you could see a small white plate with two razor blades and what appeared to be crack cocaine on the plate itself.

After Mr. Lee summoned Petitioner from the back of the residence, Petitioner spoke to the agents, who advised him that they had already seen drugs in his house.  Petitioner commented that more drugs were in the kitchen cabinet.  Brook said that the agents then secured the residence to make sure there were no other people inside and made a security sweep for weapons.  During this time, Petitioner admitted that he had a .40 caliber pistol in his pocket.  He also admitted that all the firearms and drugs located in the residence were his. But Petitioner also told the agents that they could not continue the search of his house.  The police then obtained a search warrant before resuming the search.  Tr. 21-25.

On cross examination, Agent Brook said that Lee, when he saw the agents approaching the house, "walked up into the house and shut the door."  The following exchange then occurred:

> Q.    He gave you permission to enter even though he wasn't the homeowner?
>
> A.    That's correct.
>
> * * * * *
>
> Q.    As you entered into the residence you said you saw a small amount of cocaine, is that correct?
>
> A.    That's correct.
>
> Q.    Did you detain Mr. Lee at this time?
>
> A.    Yes.
>
> Q.    Was he handcuffed?
>
> A.    Yes, he was.

Tr. 33-35.

Agent Jerry Oglee offered similar testimony that Brook "got permission to enter the residence" from a "black male who gave us permission to come in."  Oglee then testified:

> We started talking to that black male.  As Agent Brook was talking to that black male, another black male came into the room.  At that time we had seen some stuff on the cabinet which gave us reason to be there.  Mr. Shed was asked if there was any weapons in the house for officer safety.

Oglee was asked to elaborate about the "stuff" officers had seen.  He testified that "it was a plate actually with a razor blade on it with what looked like narcotics residue and a set of

scales beside that."  He added that Petitioner admitted, when asked if he had any weapons, that he had a .40 caliber pistol in his front pocket.  Tr. 36-39.  Other agents testified about the search, but they did not become involved until after Brook and Oglee made the initial entrance and a search warrant was obtained.  Clarence Lee was called by the defense and asked if he was the owner of the cocaine, but he pleaded the Fifth Amendment.  Tr. 75. The above is a fair summary of testimony in the gun prosecution that is relevant to the issues in this habeas proceeding.

### C. Testimony from the Free and Voluntary Hearing

Petitioner has also pointed to testimony from the companion drug prosecution. The conviction rendered in that case is not before the court in this proceeding, but the record of that case includes testimony about the same events at issue here.  Petitioner has quoted from a "free and voluntary" hearing that was held in the drug case about three weeks before the felon-in-possession trial, and the district attorney has filed a transcript of that hearing into this record.  Doc. 17.  Citations below are to the pages in that transcript.

The purpose of the free and voluntary hearing was to determine the admissibility of statements made by Petitioner to police.  There is no indication that a Fourth Amendment challenge was at issue during the hearing.  Mr. Vergis also represented Petitioner in the drug case and, as in the gun case, there is no indication Vergis filed a motion to suppress.

Agent Brook's testimony about how the officers entered the house is somewhat different from the testimony (summarized above) that he would offer three weeks later at trial in the gun case.  He testified:

Q.    (By Mr. Vergis) Was Clarence Lee inside the house?

A.    Yes, he was.

Q.    Once Clarence Lee answered the door was he the one that actually let you in?

A.    We asked if he was the homeowner of the house, he said no, that Willie was and that he would get him and that Willie was in the rear of the residence or somewhere in the residence.  *We waited at the door until Mr. Shed came around to the front door.  We stepped inside the doorway prior to Mr. Shed coming to the front door due to the fact that we observed the cocaine in plain view.*

Q.    At what point did you actually enter the house?

A.    Right before Mr. Shed come around.

Q.    And that's because you saw the cocaine on the washing machine?

A.    Washing machine, yes.

Tr. 8 (emphasis added).  Brook, as discussed above, would testify three weeks later at the felon-in-possession trial that officers entered the house after Lee invited them to wait in the kitchen while Lee summoned Mr. Shed, and it was only after the officers were inside the kitchen that they saw the drugs.

Clarence Lee testified at the free and voluntary hearing.  He said he had been discussing some possible remodeling work that he would do for Petitioner.  He said he

"stepped outside and stepped back in and shortly after that there was a knock on the door." Lee said the persons knocking said they were the police and, because Petitioner was in the back, he sat and waited.  Lee further testified: "They said open the door before we kick it in so I opened it.  They proceeded to come in and search everybody."  Tr. 14.  Lee said that he hesitated to open the door before the threat to kick it down because curtains prevented him from seeing who was really outside.  Tr. 16.

Agent Brook was then called back to the stand, and he disputed Lee's testimony during this exchange:

> Q.  Prior to entering the house did you yell anything into the house after knocking on the door?
>
> A.  No, I did not.
>
> Q.  Did Agent Oglee yell anything into the house?
>
> A.  I believe I would have heard that.
>
> Q.  Would anyone have made the statement to the effect of open up or we will kick the door in?
>
> A.  Not that I'm aware of.
>
> Q.  Do you think Agent Oglee might be aware of that?  You don't recall hearing that?
>
> A.  I don't recall hearing any of that, no.
>
> Q.  And I take it you don't recall saying it?
>
> A.  No.

Tr. 19-20.

**Federal Evidentiary Hearing**

### A. Federal Hearing Is Permitted

The state court chose to address the ineffective assistance claim on direct appeal, rather than defer it to a post-conviction application, so there was no state court hearing. The lack of factual development of the claim is not a failure attributable to Petitioner under 28 U.S.C. § 2254(e)(2).  The statute provides: "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the [federal] court shall not hold an evidentiary hearing on the claim unless the applicant" makes certain showings (that appear impossible in this case.). The Supreme Court has explained that "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams v. Taylor, 120 S.Ct. 1479, 1488 (2000). "Diligence ... depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." Id. at 1490.

The factual basis of the ineffective assistance claim should include information about what counsel knew at the relevant time, and all of that information was not developed in state court. But the lack of development of those facts was not due to any lack of diligence by Petitioner. Trial counsel may have failed, but that is the crux of the claim. Appellate counsel immediately raised the issue, and the appellate court addressed the issue on direct appeal. The court could have, as it acknowledged, followed the "general rule" of deferring consideration

of the claim until raised in a post-conviction application, which would create "the opportunity for a full evidentiary hearing." Shed, 828 So.2d at 130. Instead, the court concluded that the "record is sufficient" and proceeded to address the failure-to-suppress claim.

Had Petitioner attempted to renew the Strickland claim in a post-conviction application, he likely would have found defeat at the hands of La.C.Cr.P. art. 930.4(A), which states: "Unless required in the interest of justice, any claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered." If the appellate court had declined to address the Strickland issue until post-conviction proceedings, the Article would not have served as a bar. See State v. Roland, 865 So.2d 692 (La. 2004) and State v. Robinson, 816 So.2d 846 (La. 2002) (reversing appellate courts that considered Strickland claims on direct appeal without an adequate record and observing that the claim, since not addressed, would not be considered fully litigated on appeal for purposes of Article 930.4(A)).

Petitioner would perhaps have been better served to wait to raise the Strickland issue in a post-conviction application, but he certainly cannot be faulted for lack of diligence because he chose to raise the claim at the first opportunity. Petitioner did not fail to pursue his claim. In hindsight, his procedural strategy may not have been perfect, but it was a reasonable and diligent effort to pursue and develop the Strickland claim. Thus, a federal hearing, to which the State has not objected, is permissible.

Page 13 of  28

### B. Evidence at the Federal Hearing

The undersigned scheduled a hearing and permitted the parties to present any evidence they had relevant to the issue.  Petitioner called Clarence Lee, and the State called attorney Michael Vergis.  Neither party called Officers Oglee or Book. The State also submitted some documents and notes from Vergis' file.

Clarence Lee, Jr. testified at the federal hearing that he had known Petitioner for several years, but he did not live with Petitioner and had never spent the night at his house. Lee said he was at Petitioner's house on the day of the arrest.  He said that he was there to discuss some work that he was doing for Petitioner on some rental homes.  Lee said that he stepped outside to stub out a cigarette, returned inside and sat down at the table with a pencil in his hand. The police arrived just afterward and knocked on the door.

Lee testified at the federal hearing that the police told him to open the door or they would break it down, so he opened the door and called Petitioner's name.  He said the police had already opened the burglar bars outside the door.  One officer had a gun in his hand, pointed toward the ground.  The other officer, when Lee opened the door, walked past Lee like he was not there and entered the house.  Lee said the police told him to sit down, and he did.  Lee testified that he did not recall telling the police that he was not the owner of the house. In contrast, however, Lee admitted that he executed an affidavit (Doc. 23) shortly before the federal hearing in which he testified: "I told them I was not the owner and attempted to go to the back of the house to get the owner, Willie Ray Shed, Jr.  But they came

in the house and handcuffed me and started asking me my name and address." Lee testified on redirect that he did not recall exactly what was said that day. Lee said that Petitioner was arrested when he arrived in the kitchen area. Lee affirmed, during the federal hearing, that his testimony at the state-court free and voluntary hearing was truthful. He said that he pleaded the Fifth Amendment right against self incrimination at the trial, on instructions of Mr. Vergis.

Michael Vergis was an attorney with the Indigent Defender Board and was appointed to defend Petitioner against the state-court charges. Attorney Vergis testified at the federal hearing that he recalled speaking to Petitioner and Mr. Lee before trial, but he could not recall the specifics of their conversations. Vergis had no recollection of speaking to the police officers involved in the search and arrest, but he said that he generally would speak to the officers before the trial and that he was familiar with Officers Brook and Oglee.

Mr. Vergis' handwritten notes in his file reflect that a black male "let cops in house" during a knock and talk. The notes also include reference to "plain view" of drugs and a razor blade. The notes reflect that Petitioner told Vergis that the police arrived as Mr. Lee was entering the house and "bullied" their way into the house without an invitation.

Mr. Vergis's notes include an observation that Petitioner "said no MTS [motion to suppress] understands won't <u>work</u>." Mr. Vergis testified at the hearing that he did not recall the specifics of his discussion with Petitioner or his assessment of the chances a motion to suppress could prevail. He testified that his general practice would have been to review a

combination of factors, including the relative credibility of the witnesses, prior convictions and the relevant facts.  He said he believed his advice on the issue would have been based primarily upon the police saying they saw the contraband through the door in plain view.  He added that he would not forego a motion to suppress merely because the testimony of defense witnesses and police differed, but would base a decision on a review of all the facts.  Mr. Vergis also said that the prosecutors in that section of the state court would not plea-bargain in good faith with a defendant who filed a motion to suppress and lost.

Mr. Vergis said he did not investigate whether police would have been able to see, from outside the door, the place in the kitchen where the drugs were found.  Mr. Vergis was asked about a scenario in which the police could not see the drugs until they entered the kitchen, and they entered at the invitation of someone who did not own or have authority over the home.  He said there would "perhaps" be grounds for a motion to suppress in that situation, but he would have to check the state of the law at that time.  He believes that he would have looked into the issue before trial by speaking to the police to get the facts straight and researching the relevant law.

Other documents admitted at the hearing include police reports by Officer Oglee and Brook.  These documents were in attorney Vergis's file. Officer Oglee's report reflects that he was "in the driveway watching the side of the residence" when Officer Brook approached the house during a knock and talk operation.  A black male answered the door. Oglee wrote: "I saw Agt. Brook go into the residence so I followed. Oglee describes contact with both

Petitioner and Lee inside the house and the Petitioner's admission, during pat-downs, that he was carrying a pistol. Oglee then writes in another paragraph, and without stating when in the sequence of events it happened, that "I did see in plain view a small plate with two razor blades and sch. II residue on it." Oglee added that "Beside the plate was a small set of scales."

Officer Brook's report states that he knocked on the front door of the residence and was "greeted and invited into the residence by a black male subject later identified as Clarence Lee."  Brook continued: "Once inside the residence this agent asked to speak with the home owner when Lee stated that the home owner/suspect Willie Shed was in the rear of the residence and would have him come to the front."  "While waiting in the front (kitchen/dinning) area for the suspect Willie Shed to come to the front this agent observed in plain view (on a washer) a small white plate with two razor blades, and a small amount of sch II crack cocaine on it."

Brook wrote that the officers then secured the evidence and the suspects "for officer safety due to suspect Shed advising that he had a loaded gun (.40 cal auto) in his right front pocket." That pistol and another gun found in the house were the basis for the conviction at issue.  Shed reportedly admitted where two rocks of crack were in the kitchen, and the officers found the crack, but Petitioner refused to consent to any further search of his home. The officers sought a search warrant.

Officer Brook's affidavit in support of a search warrant for the residence contains a similar description of the events.  He testified that, when he arrived there and knocked on the door, he "was invited into the kitchen area by a older black male subject who stated that Willie Shed was in the rear of the residence."  He continued, "Once inside the door the Affiant observed a small white plate containing two razor blades and a small amount of suspected rock 'crack' cocaine, as well as a set of black digital scales laying in plain view." Nothing in the police reports or affidavit suggest that any officer saw any indication of drugs *before* Brook entered the house at the alleged invitation of Mr. Lee.

**Analysis**

Attorney Vergis advised his client that a motion to suppress would be futile.  The state appellate court rejected a claim that the advice constituted ineffective assistance of counsel. The question for this court is whether the state court's decision was an unreasonable application of clearly established Supreme Court law so that habeas relief is available under Strickland and Kimmelman.

"The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." Kimmelman, 106 S.Ct. at 2588. Counsel, at the time he would have been deciding whether to file a motion to suppress, possessed the police officers' contemporaneously written reports, Officer Brook's affidavit in support of the search warrant, and whatever information counsel gained from interviewing his client, Mr. Lee and the officers.  The written records

and the memory of the witnesses show that counsel would have been presented two sets of competing facts as to how the search occurred.

Mr. Shed was not present when officers entered the house, so he had no direct evidence to offer on the point. Mr. Lee, to whom counsel spoke before trial, would have told counsel what Lee testified to at the free and voluntary hearing, at the trial, and in an affidavit: the police entered the home without his consent or invitation. The police reports and affidavit from Officer Brook are consistent in the alternative, competing version: Mr. Lee gave Officer Brook permission to enter the residence.

Attorney Vergis testified that he would have based a decision on whether to file a motion to suppress on factors that included his assessment of the relative credibility of the witnesses. Mr. Lee's version of the facts would plainly support a motion to suppress if that testimony were accepted, but the Constitution does not mandate that counsel file a motion to suppress any time there is a witness whose version of the facts would warrant relief. Counsel is free to advise his client not to file a motion to suppress, despite such a witness, if he believes that the witness's credibility would not be accepted and that defense efforts are better directed at other aspects of the case. Accordingly, counsel's knowledge of Mr. Lee's version of the facts, which was not supported by any corroborating evidence, does not render ineffective his failure to file a motion to suppress.

Officer Brook testified at the free and voluntary hearing in the drug case that he entered the house, not at the invitation of Mr. Lee, but after he saw cocaine inside the house

in plain view while he was standing outside the front door.  Brook's contemporaneously written report, his search warrant affidavit, and his trial testimony are all to the contrary and present the version of the facts relied upon by the state appellate court when it assessed the Strickland claim.  That version of the facts is almost certainly the version that counsel would have been considering when determining whether to file a motion to suppress, and it is most likely the testimony that would have been offered at a hearing on that motion.  That version of the facts is that Mr. Lee opened the door when Officer Brook knocked, Mr. Lee told Brook that he was not the homeowner, and Mr. Lee invited Brook into the kitchen to wait while Lee summoned the homeowner.[3]

The state appellate court found that counsel was not ineffective for failing to file a motion to suppress in view of those facts because Lee had apparent authority to "open the door and invite the officers inside while he got the owner."  The appellate court added that

---

[3] Neither party now contends that the actual facts are that police saw the drugs in plain view from outside the home. If those were the accepted facts, there would be no fault in not filing a motion to suppress. Courts have faced similar situations in which police see drugs or other contraband in plain view inside a house and then enter the house without a warrant.  The courts often uphold the legality of the entry on the grounds that the officer's action was justified because of exigent circumstances due to the risk that the contraband would be removed or destroyed if the officer instead elected to wait and attempt to get a warrant.  That is especially so if the occupants of the house knew that police had become aware of the contraband and the officers did not have, prior to alerting the occupants to their knowledge, probable cause sufficient to obtain a warrant.  See, e.g., U. S. v. Jones, 239 F.3d  716 (5th Cir. 2001); U. S. v. Guinyard, 149 Fed. Appx. 279 (5th Cir. 2005); State v. Pounds, 789 So.3d 721 (La. App. 4th Cir. 2001); State v. Evans, 908 So.2d 1201 (La. App. 3d Cir. 2005); U.S. v. Elkins, 300 F.3d 638, 655 (6th Cir. 2002); and 3A Federal Practice & Procedure: Federal Rules of Criminal Procedure § 668.4 (Searches Without a Warrant – Exigent Circumstances).

Petitioner "never advised the police that Lee lacked authority to let them in." Shed, 828 So.2d at 131-32.

The State has not shown adequate support for the conclusion that Mr. Lee had apparent authority to consent to entry of Petitioner's home.  The facts are uncontested that Mr. Lee was a casual visitor to the home and told police that he was not the owner.  The police did not make any further inquiry as to Mr. Lee's authority with respect to the home. Apparent authority of a consenting party validates a search only if the facts available to the officer at that time would warrant a man of reasonable caution in the belief that the consenting party had authority over the premises. Illinois v. Rodriguez, 110 S.Ct. 2793, 2801 (1990).  "If not, then warrantless entry without further inquiry is unlawful unless authority actually exists." Id.

Officers knew only that Mr. Lee was standing in the doorway and that he was not the homeowner.  They did not know whether he was a resident, a burglar, a repairman or a neighbor visiting for coffee.  They asked no questions of Lee to determine his status with respect to the home or his authority to allow persons inside. No person of reasonable caution could have believed, based on nothing but Mr. Lee's bare presence in the home and statement that he was not the owner, that he had authority over the premises.

The State asserts that those rules might prohibit officers from establishing apparent authority that Mr. Lee could give consent to a *search* of the home but that officers could reasonably believe that Lee had authority to answer the door and *invite the officers inside*

while Lee went to summon Petitioner.  The State does not cite any authority that has recognized such a distinction, and it attempts to put the burden on Petitioner to show clearly established federal law regarding who has the authority to answer a door and admit police to await the homeowner.  Petitioner may have the burden of establishing that the state courts unreasonably applied clearly established law regarding his Strickland ineffective assistance of counsel claim, but an aspect of whether counsel performed reasonably must consider the fact that the burden at a hearing on a motion to suppress would have fallen upon the State to establish a lawful basis for the warrantless entry of the home.  The State has not cited authority that has permitted police officers to justify warrantless entry into a home without the homeowner's consent by pointing out that they were invited in by a person who happened to be present in a home (and about whom nothing else is known), so long as the person did not allow officers to go further and engage in a more intrusive search of the home, such as by opening drawers and turning over couch cushions.

Justice Scalia, writing for the unanimous court in Illinois v. Rodriguez, did not use language that permitted of such an exception.  The Court did not speak of whether officers might believe a person had authority to permit an invasive search.  Rather, the opinion's language draws the line at the threshold of the home.  It speaks of whether officers may "accept a person's invitation to *enter* premises" (emphasis added) and cautions that without actual or apparent authority the warrantless "entry" is unlawful.

Drawing the line at any entry into the home is consistent with other Supreme Court decisions. The police, in <u>Silverman v. U.S</u>., 81 S.Ct. 679 (1961), attached an electronic device to a heating duct of a house, thereby turning the duct into a gigantic microphone that ran throughout the house. The device was a microphone with an attached spike about a foot long. The officers inserted the spike under a baseboard in a connected home and made contact with the duct that served the suspect house. That slight physical intrusion was sufficient to render the search (eavesdropping) unconstitutional.

The Court has also declared that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." <u>United States v. United States District Court</u>, 92 S.Ct. 2125 (1972). It again emphasized the sanctity of the home in <u>Payton v. New York</u>, 100 S.Ct. 1371, 1382 (1980), stating that "the Fourth Amendment has drawn a firm line at the entrance to the house." When the Court held in <u>Kyllo v. U.S</u>., 121 S.Ct. 2038 (2001) that warrantless thermal imaging of a home was an unreasonable search, it wrote:

> "The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained. In <u>Silverman</u>, for example, we made clear that any physical invasion of the structure of the home, '*by even a fraction of an inch*,' was too much...." (emphasis added).

<u>Kyllo</u>, 121 S.Ct. at 2045.

No matter the sanctity of the home, the homeowner or other person with suitable authority may invite a police officer inside. If the person who makes the invitation has actual authority to do so, the entry will be lawful. A third-party such as Mr. Lee may have actual

authority to make such an invitation if he "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." U.S. v. Matlock, 94 S.Ct. 988, 993 (1974). Actual authority rests "on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id. at n. 7. Sometimes the third-party will have authority only over common areas or limited parts of the home, and that is where his authority and consent end. There is no contention or evidence that Mr. Lee had actual authority to permit entry into any portion of Petitioner's home.

The State in this case must rely on apparent authority, which requires the State to show that the facts available to Officer Brook at that time he entered the house would warrant a man of reasonable caution in the belief that Mr. Lee had actual authority, as defined in Matlock, to invite a person into the home. Brook need not be right, but he must have been reasonable in mistakenly concluding that Lee had actual authority. Illinois v. Rodriguez, supra. Brook knew that (1) Lee was inside the house and (2) Lee was *not* the homeowner. That is all Brook knew about Lee. The record discloses no other facts that Brook knew about Lee's relationship to the home that would warrant a man of reasonable caution in the belief that Mr. Lee had actual authority to invite Brook into the home.

At best, the situation was ambiguous, which obligates a reasonably cautious man to investigate further or make "further inquiry" before relying on the consent to enter. <u>Illinois v. Rodriguez</u>, 110 S.Ct. at 2801; <u>U.S. v. Waller</u>, 426 F.3d 838, 846-47 (6th Cir. 2005). Even if Lee had claimed to live in the house, <u>Rodriguez</u> warns that officers may not always automatically accept such an assurance:

> "[W]hat we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."

110 S.Ct. at 2801.

Under the State's rationale, however, a plumber, visitor, burglar or anyone else who opened the door to police (and said that he was not the owner) could invite the police inside the home and the police, without asking any questions to verify the person's authority over or relationship to the premises, could use that invitation to justify a warrantless entry of the home.  The officers' mere entry would allow them, without more invasive steps such as opening drawers or looking under furniture, to see areas of the home that they would not have a plain view of from outside the home.

<u>Kyllo</u> observed that "there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor." 121 S.Ct. at 2045.  "In the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes." <u>Id</u>.(emphasis in

original). Counsel possessed police reports showing that officers did more than crack open the door, they entered the home, and the entry was based on the alleged invitation of a person about whom officers had no idea his status with respect to the property except that he did not own it. Such an entry of the home, absent a warrant, actual or apparent authority, or other legally recognized exception, would be unreasonable under Rodriguez and violate the Fourth Amendment. Counsel ran afoul of Strickland when he did not file a motion to suppress in those circumstances.

The court is aware of and sympathetic to the time and resource demands faced by attorneys who defend indigent defendants in Louisiana.  Those obstacles occasionally cause counsel, like judges and others, to make mistakes.  Counsel made a mistake in this case when he did not, based on the facts presented to him and the relevant law, file a motion to suppress the evidence that police saw and seized only after they entered Petitioner's home without a warrant and without actual or apparent authority.  Had counsel filed the motion to suppress and presented to the court the evidence that was then known to him, there is every indication that the motion would have been meritorious and would have been granted if Rodriguez and other applicable laws were faithfully applied. The suppression of the firearms that were found by the officers once they were inside the house would preclude the conviction at issue. The state court, for the reasons explained above, unreasonably applied the relevant federal law when it assessed the ineffective assistance claim.

A final issue stems from Attorney Vergis's testimony that the prosecutors in the division where Petitioner's case was pending refused to bargain in good faith with defendants who filed a motion to suppress. The State urges that this consideration made counsel's failure to file a motion sound strategy. There is no suggestion in Attorney Vergis's notes or testimony, however, that he counseled his client that a motion to suppress would be meritorious but that he nonetheless recommended against filing the motion because of such plea bargaining concerns. Rather, Vergis's notes suggest that he simply told Petitioner a motion to suppress would not work. There is also no evidence that Petitioner sought a plea bargain before he went to trial. Accordingly, the potential obstinance of local prosecutors when dealing with defendants who exercise their constitutional rights did not excuse the lack of advice to file motion to suppress in this case.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be granted and that Petitioner's conviction be vacated.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 6th day of June, 2007.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE